UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

IN RE:                      :         <u>MEMORANDUM DECISION</u>
                         :            <u>AND ORDER</u>

TERRORIST ATTACKS ON     :
SEPTEMBER 11, 2001         :        03 MDL 1570 (GBD) (SN)
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

> *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132
> *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-6977
> *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848
> *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978
> *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-mc-740

GEORGE B. DANIELS, United States District Judge:

     In this multidistrict litigation, four groups of judgment creditors ("Judgment Creditors")[1]

with judgments against the Taliban stemming from the terrorist attacks on September 11, 2001

(the "9/11 Attacks") moved for turnover to satisfy their judgments with assets in the name of

Afghanistan's central bank, Da Afghanistan Bank ("DAB"), held at the Federal Reserve Bank of

New York (the "FRBNY"). (ECF Nos. 7763, 7767, and 7936 in No. 03-md-1570; ECF No. 62 in

No. 01-cv-10132; ECF No. 597 in No. 03-cv-9848.)[2] Before this Court is Magistrate Judge Sarah

Netburn's August 26, 2022 Report and Recommendation (the "Report"), recommending that this

Court deny the Judgment Creditors' motions and not allow Judgment Creditors of the Taliban to

---

[1] The Judgment Creditors are the four sets of Plaintiffs in the following cases: *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132 (the "*Smith* Creditors"), *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848 (the "*Havlish* Creditors"), *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978 (the "*Federal Insurance* Creditors"), and *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-mc-740 (the "*Doe* Creditors"). In their filings, Judgment Creditors refer to themselves collectively as the "Joint Creditors."

[2] Unless otherwise indicated, all references made herein to the docket sheet refer to the main docket sheet for this multidistrict litigation, No. 03-md-1570. Plaintiffs in *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-6977 ("*Ashton* Plaintiffs") also filed an *ex parte* motion for attachment. (ECF No. 8412; ECF No. 1724 in No. 02-cv-6977.)

satisfy their judgments with DAB funds. (*See* Report, ECF No. 8463, at 2.) Magistrate Judge Netburn advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections on appeal. (*Id.* at 42–43.) Judgment Creditors filed objections on November 10, 2022, (*see* Objections, ECF No. 8733),[3] and *amicus curiae* Mr. Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan, responded to those objections on November 25, 2022, (*see* Faiq Nov. 25, 2022 Letter, ECF No. 8773).[4]

Because the parties filed timely objections, this Court undertakes a *de novo* review of the Report. After doing so, this Court ADOPTS Magistrate Judge Netburn's Report in finding that this Court lacks subject-matter jurisdiction over the turnover motions under the FSIA, (Report at 12–26), and that this Court is constitutionally restrained from determining the Taliban is the legitimate government of Afghanistan as required to attach DAB's assets, (Report at 27–37).[5] For the reasons stated herein, the Judgment Creditors' turnover motions are DENIED.

---

[3] *Ashton* Plaintiffs joined the Judgment Creditors' objections in part. (*See Ashton* Nov. 16, 2022 Letter, ECF No. 8756.)

[4] This Court accepts the *amicus* letter from Mr. Faiq as a response to the Judgment Creditors' objections because Magistrate Judge Netburn granted Mr. Faiq's motion, among others, for leave to file an *amicus* brief on April 27, 2022, prior to the issuance of her Report. (*See* Report at 10–11 (citing Order on *Amici*, ECF No. 7925; also citing Faiq Am. *Amicus* Br., ECF No. 7932-1); *see also* procedural history *infra* Section II.C.)

[5] This Court declines to adopt the Report's determination that the Taliban's nonconsensual control prevents DAB from being a Taliban agency or instrumentality. (*See* Report at 37–41.) It is not this Court's responsibility to assess whether the fact that "DAB has been violently occupied by the Taliban" via the Taliban takeover of Afghanistan consequently disqualifies DAB as an instrumentality of the Taliban. (*Contra id.* at 37.) One need only look at numerous examples throughout the world to understand the historic role of military force in the destruction and formation of recognized governments. This Court thus rejects the Report's finding that "the relationship between a terrorist [party] and its agency or instrumentality must be consensual." (*Id.* at 40); *see also, Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 523 (S.D.N.Y. 2017), *rev'd and remanded on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ("*Kirschenbaum II*") ("As a matter of law . . . this Court does not believe knowledge of instrumentality status is a required element for a TRIA § 201(a) claim; . . . people or entities may become the unwitting instruments of another.").

## I.   LEGAL STANDARD

A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth in a magistrate judge's report. 28 U.S.C. § 636(b)(1)(C). The court must review *de novo* the portions of a magistrate judge's report to which a party properly objects. *Id.* The court, however, need not conduct a *de novo* hearing on the matter. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). Rather, it is sufficient that the court "arrive at its own, independent conclusion" regarding those portions of the report to which objections are made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189–90 (S.D.N.Y. 1985) (citation omitted).

Portions of a magistrate judge's report to which no or "merely perfunctory" objections are made are reviewed for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (citations omitted). The clear error standard also applies if a party's "objections are improper—because they are 'conclusory,' 'general,' or 'simply rehash or reiterate the original briefs to the magistrate judge.'" *Stone v. Comm'r of Soc. Sec.*, No. 17-cv-569 (RJS)(KNF), 2018 WL 1581993, at *3 (S.D.N.Y. Mar. 27, 2018) (citation omitted). Clear error is present when "upon review of the entire record, [the court is] 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

## II.   BACKGROUND

### A. Afghanistan and 9/11

The 9/11 Attacks resulted in the murder of nearly three thousand innocent people and injuries to thousands more.[6] In the ensuing days, U.S. President George W. Bush launched a global

---

[6] This Court assumes familiarity with the general background of this case and will only restate relevant factual background as necessary to address the pending motions. Because Sections I and II of the Report are adopted in full unless otherwise noted, this Court refers to facts detailed in the Report throughout this opinion.

military campaign to respond to the 9/11 Attacks and counter international terrorism. Since 1996, the Taliban had *de facto* control over the Islamic Emirate of Afghanistan, although the United States did not recognize the Taliban as Afghanistan's government.[7] President Bush demanded that the Taliban permanently close terrorist training camps within Afghanistan's borders and hand over those responsible for the 9/11 Attacks, principally al Qaeda leader Osama bin Laden. (*See Smith*, No. 01-cv-10132, ECF No. 63-3, Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 2 (2021) ("Taliban Background").) When the Taliban refused, the United States and coalition allies invaded Afghanistan on October 7, 2001 as part of Operation Enduring Freedom. *See id.* 2–3. Taliban forces fled Kabul, and the Islamic Emirate of Afghanistan collapsed within weeks. *Id.* The United Nations helped form an interim, and then transitional, government backed by U.S. and allied forces, culminating in the formation of the Islamic Republic of Afghanistan (the "Republic") in 2004. *See id.* at 3, 28.

Following a brutal war spanning two decades, the Taliban has returned to power in Afghanistan. During the administration of President Donald Trump, a February 2020 U.S.-Taliban agreement stipulated that the United States and its allies would fully withdraw all international forces from Afghanistan by May 2021. In April 2021, President Joseph Biden postponed this deadline to August of the same year. *Id.* at 6–7. The Taliban soon thereafter began a sweeping military offensive, capturing large swaths of Afghanistan before finally entering Kabul to overthrow the Republic on August 15, 2021. *See id.* at 7–8. Although U.S. forces managed to evacuate approximately 124,000 people up until the last American soldier left Afghanistan on August 30, 2021, the chaotic final days of U.S. presence coincided with a catastrophic suicide

---

[7] "The United States did not recognize the 1996-2001 Taliban government, maintaining that between 1996 and 2000, 'there was no functioning central government' in Afghanistan." (*Smith*, No. 01-cv-10132, ECF No. 63-3, Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 28 (2021) (citation omitted).)

bombing at Kabul's international airport and stranded hundreds of U.S. citizens and tens of thousands of Afghans who had worked with the United States. *See id.* at 22–23.

The people of Afghanistan then faced a relentless barrage of calamities. Up to 97 percent of Afghans may fall into poverty amid the collapse of the banking sector, and more than a million children are at risk of dying of starvation. (See Report at 4 (citing Faiq Am. *Amicus* Br., ECF No. 7932-1, at 2–3).) Some families have resorted to selling bodily organs or their own children to afford food. (*See id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br., ECF No. 7896-1, at 5; also citing Faiq Am. *Amicus* Br. at 3).) The Taliban is ruthlessly hunting down journalists, civil society leaders, women activists, religious and ethnic minorities, former Republic officials, and former Afghan security forces who served with U.S.-allied forces. (*See id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br. at 6).) After issuing edicts banning women from attending high school or college, the Taliban recently imposed a ban on women conducting humanitarian work, endangering approximately 28 million Afghans who desperately need assistance to survive a harsh winter, economic collapse, and the risk of famine. *See UN and Top Aid Officials Slam Afghan Rulers' NGO Ban for Women*, UN NEWS (Dec. 29, 2022), https://news.un.org/en/story/2022/12/1132082.

As before, the United States does not recognize the Taliban regime as the *de jure* government of Afghanistan. (*See* Report at 4 (citing U.S. Statement of Interest, ECF No. 7661, at 34.) Indeed, no country in the world does. *See, e.g.*, Belquis Ahmadi & Scott Worden, *The Taliban Continue to Tighten Their Grip on Afghan Women and Girls*, U.S. INSTIT. PEACE (Dec. 8, 2022), https://www.usip.org/publications/2022/12/taliban-continue-tighten-their-grip-afghan-women-and-girls.

**B. Da Afghanistan Bank**

DAB has been the central bank of Afghanistan since its founding in 1939. (Report at 4 (citing Decl. Alex Zerden, ECF No. 7766 ¶ 16).)  When the Republic fell in August 2021, DAB held approximately $7 billion in assets at the FRBNY.  (*Id.* (citing *Havlish* Mem. of Law on Mot. for Turnover, ECF No. 7764).  Most of these funds came from international donors and the savings of Afghan citizens.  (*Id.* (citing Faiq Am. *Amicus* Br. at 19 n.18).)  The U.S. Treasury Department blocked the assets on August 15, 2021—the same day that the Taliban entered Kabul.  (*Id.* (citing Taliban Background at 39).)  While the action helped ensure that the funds would not fall into Taliban hands, it further exacerbated Afghanistan's humanitarian crisis because Afghan "banks were unable to lend money and citizens [were] unable to withdraw their own funds."  (*Id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br. at 5).)

In February 2022, President Biden issued an executive order titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan."  Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ("E.O. 14,064").  The order addressed the frozen assets and stated that "the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan." *Id.*  Executive Order 14,064 determined that "the widespread humanitarian crisis in Afghanistan—including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs" constituted an "unusual and extraordinary threat to the national security and foreign policy of the United States."  (Report at 5 (quoting E.O. 14,064).)  As a result, President Biden declared a national emergency and ordered that "[a]ll property and interests in property of DAB

that are held . . . in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked . . . ." (*Id.* (quoting E.O. 14,064 § 1(a)).)

The U.S. Treasury's Office of Foreign Assets Control ("OFAC") implemented Executive Order 14,064 through its issuance of License No. DABRESERVES-EO-2022-886895-1. (*Id.* (citing U.S. Statement of Interest, Ex. B, ECF No. 7661-2 (the "OFAC License").) The United States sought to use the license to transfer $3.5 billion—approximately half of DAB's assets— "for the benefit of the people of Afghanistan, including to an international financing mechanism (in which the United States is a member) holding and disbursing funds for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." (*Id.* (quoting OFAC License § 1(b)).) The United States reported that this OFAC License could not take effect without the Court modifying the writs of execution obtained by the Judgment Creditors or otherwise confirming that the writs did not restrain the $3.5 billion the license sought to transfer. (*Id.* at 5–6 (citing U.S. Statement of Interest at 2–3).) On February 25, 2022, Magistrate Judge Netburn issued an order with the parties' consent confirming that the writs did not restrain the $3.5 billion under the OFAC License. (*See* U.S. Dep't of Just. Feb. 24, 2022 Letter, ECF No. 7700; Order on OFAC License, ECF No. 7701.) The FRBNY retained the remaining DAB funds of $3.5 billion at issue here. (Report at 5–6.)

## C. Procedural History

The Judgment Creditors hold default judgments against the Taliban for their losses arising from the 9/11 Attacks and other acts of terrorism. (*See id.* at 6–9 (detailing judgments and timeline).) The *Havlish* Creditors and *Smith* Creditors brought suit and obtained default judgments against the Taliban for losses suffered on 9/11. (*Id.* at 6–8.) The *Federal Insurance* Creditors are insurance companies that made payments because of the 9/11 Attacks and obtained a default

judgment against the Taliban for their economic losses.  (*Id.* at 7.)  The *Doe* Creditors obtained a default judgment against the Taliban, among others, arising from a 2016 attack by the Taliban and other terrorist groups at a contractor compound in Afghanistan.  (*Id.* at 8.)  All of the Judgment Creditors hold judgments against the Taliban that remain substantially unsatisfied.  (*See id.* at 6–9.)

The Judgment Creditors now seek to satisfy their judgments against the Taliban with DAB assets.  The Republic was defending against claims consolidated in this multidistrict litigation until the Taliban takeover.  (*See, e.g.*, *Faulkner v. Bin Laden, et al.*, No. 09-cv-07055, ECF No. 184.)  After the Republic fell, the Judgment Creditors obtained writs of execution targeting DAB funds held at FRBNY and later filed respective motions for turnover of the funds pursuant to Federal Rule of Civil Procedure 69(a), New York Civil Practice Law and Rules ("CPLR") §§ 5225(b) and 5227, and the Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107-297, 116 Stat. 2337, as amended, Pub. L. No. 112-158, 126 Stat. 1260 (codified at 28 U.S.C. § 1610 note).  (*See* Report at 6–9 (detailing motions and timeline).)  No Judgment Creditor holds a judgment against the state of Afghanistan or DAB.  (*Id.* at 6.)  Further, no representative for Afghanistan, DAB, or the Taliban is currently defending in this multidistrict litigation.  (*Id.*)

The United States Government filed a Statement of Interest for these turnover proceedings.  (*See* U.S. Statement of Interest.)  Factually, the United States stated that DAB is the central bank of Afghanistan, (*id.* at 8), and provided that the United States has not recognized the Taliban or any other entity as the government of the state of Afghanistan, (*id.* at 26).  While acknowledging "a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law," (*id.* at 19), the United States asserted "a strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign

governments and . . . in ensuring the proper construction of TRIA and the Foreign Sovereign Immunities Act," (*id.* at 3). The United States took "no position" on whether the Judgment Creditors had satisfied TRIA's requirements for turnover of DAB's assets. (Report at 9 (citing U.S. Statement of Interest at 19–20).) However, the United States noted that the courts should narrowly construe exceptions to the immunity of foreign sovereign property and measure such exceptions "against a benchmark that accounts for the risk of reciprocal challenges to American property abroad." (*Id.* at 10 (citing U.S. Statement of Interest at 27).) Further, the United States argued that the Judgment Creditors "must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government" because such a determination would infringe on the President's constitutional powers to recognize a foreign government. (*See* U.S. Statement of Interest at 26–27.)

Magistrate Judge Netburn accepted four *amicus curiae* briefs on these turnover motions. (Report at 10.) The briefs are from (1) the Women's Forum on Afghanistan (Women's F. Mar. 30, 2022 Letter, ECF No. 7823, at 3–4), (2) the Center for Constitutional Rights on behalf of four Afghan civil-society organizations (Afghan Civ. Soc'y Orgs. *Amicus* Br.),[8] (3) the non-governmental organization Unfreeze Afghanistan (Unfreeze Afghanistan *Amicus* Br., *Havlish*, No. 03-cv-9848, ECF No. 617), and (4) the Open Society Justice Initiative, submitted on behalf of Mr. Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan (Faiq Am. *Amicus* Br.). Together, "[t]hese briefs describe the devastating effects that the Taliban's takeover has had on Afghan civil society and on the Afghan people. They also raise[]

---

[8] Those organizations are Global Advocates for Afghanistan, the Afghan Network for Advocacy and Resources, Afghans For A Better Tomorrow, and the Afghan-American Community Organization. (*See* Afghan Civ. Soc'y Orgs. *Amicus* Br. at vi–vii.)

9

several legal arguments against the Judgment Creditors' turnover motions." (Report at 11.) Magistrate Judge Netburn rejected two amicus briefs from groups that included members already represented in this litigation. (Apr. 27, 2022 Order on *Amici*, ECF No. 7925; May 2, 2022 Order on *Amici*, ECF No. 7941.) This Court also denied, based on being unhelpful and untimely, subsequent separate motions for leave to submit briefs as *amici curiae* from Osen LLC and Freshfields Bruckhaus Deringer US LLP on behalf of unnamed "former members of Congress and former government officials." (*See* Nov. 29, 2022 Order on *Amici*, ECF No. 8776, at 3.) Additionally, the FRBNY submitted a single non-substantive letter. (FRBNY May 20, 2022 Letter, ECF No. 8040.)

On August 26, 2022, Magistrate Judge Netburn issued her Report recommending that this Court deny the Judgment Creditors' motions and not allow the Judgment Creditors' to satisfy their judgments with DAB funds. (*See* Report at 2.) The Judgment Creditors filed timely objections on November 10, 2022, (*see* Objections), and Mr. Faiq responded to those objections on November 25, 2022, (*see* Faiq Nov. 25, 2022 Letter). The Judgment Creditors then replied to Mr. Faiq's filing. (Joint Creditors Dec. 14, 2022 Letter, ECF No. 8805.) Additionally, Mr. Faiq filed a notice of supplemental authority relating to the Report's interpretation of TRIA, (*see* Faiq Oct. 17, 2022 Letter, ECF No. 8645), and the Judgment Creditors responded, (*see* Joint Creditors Mem. of Law in Resp. to Suppl. Authority, ECF No. 8735).

## III.  MAGISTRATE JUDGE NETBURN CORRECTLY DETERMINED THAT THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE TURNOVER MOTIONS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

This Court lacks subject-matter jurisdiction over DAB and, by extension, over these turnover motions under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. DAB is the central bank of Afghanistan. As an instrumentality of a foreign state, DAB enjoys two

presumptive immunities under the FSIA: (1) immunity from jurisdiction and (2) immunity from execution on its property. Both immunities must be independently overcome for a party to reach the assets of an instrumentality of a foreign state. Here, "the Judgment Creditors propose to take their judgments against the non-sovereign Taliban, have DAB declared a Taliban instrumentality, and obtain a waiver of both DAB's immunities under TRIA § 201(a)." (Report at 20.) While TRIA can overcome jurisdictional immunity under certain circumstances, those circumstances are not present here. Therefore, DAB retains its jurisdictional immunity, and this Court lacks subject-matter jurisdiction over DAB and the turnover motions.

### A. DAB is a Central Bank Under the FSIA with Both Jurisdictional Immunity and Execution Immunity

"[T]he FSIA is the 'sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts.'" *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 113 (2d Cir. 2017) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Foreign states are immune from court jurisdiction unless a specific exception to jurisdictional immunity applies. *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) ("The FSIA provides that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' except as provided in the Act." (quoting 28 U.S.C. § 1604)). The FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (citation omitted). Thus, in order for a court to determine whether it holds subject-matter jurisdiction over a case against a foreign sovereign or its instrumentalities, the court must make a FSIA immunity determination regardless of whether the foreign state is participating in the proceedings. *Id.* at 494

11

n.20 ("[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA].").

For the purposes of the immunity determination under the FSIA, a foreign state "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The FSIA provides that an "agency or instrumentality of a foreign state" is any entity

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*Id.* § 1603(b)(1)–(3); (*see also* Report at 14 (quoting same)). A central bank is "the paradigm of a state agency or instrumentality." *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983). Here, all parties and the United States agree that DAB is the central bank of Afghanistan, although the United States has not yet recognized any regime as the *government* of Afghanistan. (*See* Report at 19.) The United States reconciles this apparent contradiction by noting that "there is a distinction between a foreign *government* and a foreign *state*, and '[a] state can . . . recognize or treat an entity as a state while denying that a particular *regime* is its *government*.'" (Statement of Interest at 25 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 cmt. a (1987)) (emphases added).) Therefore, as a central bank, DAB is the instrumentality of the foreign state of Afghanistan.

Generally, a foreign sovereign state and its agencies and instrumentalities, such as DAB, have "two types of foreign sovereign immunity [under the FSIA]—immunity from jurisdiction and immunity from attachment and execution of the sovereign's property." *Vera v. Banco Bilbao*

*Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) ("*Vera II*"). FSIA § 1604 grants foreign states and their instrumentalities immunity from *jurisdiction*, unless an exception under §§ 1605 to 1607 applies. In contrast, FSIA § 1609 renders the *property* of foreign states and their instrumentalities immune from *attachment* and *execution*, unless an exception under §§ 1610, 1611 applies. These "provisions governing jurisdictional immunity, on one hand, and execution immunity, on the other, operate independently." *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011). "[A] waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit." *Id.* (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 456(1)(b)). Thus, a party seeking to attach the central bank assets of a foreign sovereign must overcome both immunities. (*See also* Report at 15.)

Because DAB is Afghanistan's central bank, it is immune from the jurisdiction of U.S. courts under 28 U.S.C. § 1604 unless an exception to jurisdictional immunity applies. As to foreign state property, the FSIA neither grants nor forbids *in rem* civil-forfeiture actions. *See United States v. Assa Co.*, 934 F.3d 185, 190 (2d Cir. 2019) ("The FSIA does not create jurisdiction over, and does not immunize a foreign state's property from, *in rem* civil-forfeiture actions."). However, such actions face a steep climb because the FSIA was designed "to prevent the location of the [foreign state] property from conferring jurisdiction on the court—*i.e.*, to prevent *in rem* and *quasi-in-rem* actions from undermining the general principles codified in the FSIA." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999). Through the FSIA, "Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" *Assa Co.*, 934 F.3d at 190 (citation omitted).

Furthermore, central bank assets used for central banking enjoy stronger protection from execution. FSIA § 1611(b)(1) stipulates that, notwithstanding the normal exceptions permitting execution on a foreign sovereign's assets, "the property . . . of a foreign central bank or monetary authority held for its own account" is immune from attachment or execution. (*See also* Report at 15.) In drafting the FSIA, Congress determined that "[i]f execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007) (quotation marks and citation omitted). Courts must therefore be especially cautious about "weakening the immunity from suit or attachment traditionally enjoyed by the instrumentalities of foreign states" because such actions "could lead foreign central banks, in particular, to withdraw their reserves from the United States and place them in other countries." *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 98 (2d Cir. 2015) (quotation marks and citation omitted).

Here, the Judgment Creditors seek DAB assets maintained for central banking and held at the FRBNY. Therefore, to reach DAB's assets, the Judgment Creditors need exceptions to the FSIA both for DAB's jurisdictional immunity and execution immunity; they look to TRIA.

### B. TRIA Does Not Nullify DAB's Jurisdictional Immunity to Provide This Court with Subject-Matter Jurisdiction

The Judgment Creditors argue that TRIA's text nullifies any relevant constraint on DAB's jurisdictional immunity provided by the FSIA. (*See generally* Objections at 28–39.) A court begins its statutory analysis by looking to the ordinary meaning of the statutory text, rules of grammar, and statutory context. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299–301 (2017); *see also United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018) (looking to the "plain

14

language" of the statutory text).  Codified as a note to 28 U.S.C. § 1610, TRIA § 201(a)'s terrorism-related exception reads

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7)(repealed)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).  As applicable to TRIA, "courts must be careful when interpreting the scope of the FSIA's exceptions" in order to ensure foreign sovereigns are held accountable "where Congress dictated," while avoiding "a flood of suits against foreign states, prompting those nations to reciprocate in foreign suits against the United States." *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 819 (2d Cir. 2021) (citations omitted).

In arguing that TRIA's exception abrogates the FSIA's provisions on jurisdictional immunity, the Judgment Creditors assert that TRIA § 201(a)'s clause of "[n]otwithstanding any other provision of law" overcomes any barrier to execution posed by DAB's jurisdictional immunities.  (*See* Objections at 32–35; *see also* Report at 20–27.)  For such a notwithstanding clause, courts must determine the statute's scope to understand what laws are overcome by the clause.  *See Smith v. Fed. Rsrv. Bank of New York*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003), *aff'd*, 75 F. App'x 860 (2d Cir. 2003), *and aff'd sub nom. Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264 (2d Cir. 2003).  In *Smith v. Federal Reserve Bank of New York*, the District Court determined that TRIA's notwithstanding clause, although broad, "necessarily has a scope and that scope depends on the substance of the provision to which it is attached." *Id.* TRIA's notwithstanding clause does not trump every statute but rather only those which conflict

with TRIA. *See id.* ("The phrase 'notwithstanding any other provision of law' simply means that Section 201(a) controls if there is another provision of law that conflicts with it.").

Thus, the question is whether the FSIA and TRIA conflict with respect to jurisdictional immunity. They do not. "TRIA . . . [is] an execution statute," *see Weininger v. Castro*, 462 F. Supp. 2d 457, 480 (S.D.N.Y. 2006). "Congress . . . created terrorism-related exceptions to immunity under FSIA," and "[o]ne such exception is TRIA's authorization of the *attachment of the property* of terrorist parties and that of their agencies or instrumentalities." *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (per curiam) (emphasis added); (*see also* Report at 15–16).

As detailed in the Report, the language in TRIA resembles the other execution immunity language in the FSIA, distinguishing it from the FSIA's language abrogating jurisdictional immunity. "[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning." *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372–73 (2d Cir. 2022) (quotation marks and citation omitted). The sections of FSIA that 28 U.S.C. § 1604 expressly identifies as exceptions to immunity from *jurisdiction* are 28 U.S.C. §§ 1605 to 1607. 28 U.S.C. § 1604. Those exceptions stipulate when "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States . . . ." *See* 28 U.S.C. §§ 1605 to 1607; (*see also* Report at 23 (quoting provisions)). In contrast, the sections of FSIA that 28 U.S.C. § 1609 expressly identifies as exceptions to immunity from *attachment* and *execution* are 28 U.S.C. §§ 1610 (where TRIA § 201(a) exists as a note) and 1611. 28 U.S.C. § 1609. Those exceptions specify when the "property of a foreign state" or "property of an agency or instrumentality of such a state . . . shall not be immune from attachment in aid of execution . . . ." *See* 28 U.S.C. §§ 1610 to 1611; (*see also* Report at 23–24 (quoting provisions)). TRIA § 201(a) mirrors this attachment

16

and execution language, providing that "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution . . . .*" (emphasis added).  TRIA is thus rightfully categorized as an execution statute within the FSIA framework, "preserv[ing] a common law distinction between . . . jurisdictional immunity from actions brought in United States courts and immunity from attachment or execution of the foreign sovereign's property." *Weininger*, 462 F. Supp. 2d at 481.

As part of an execution statute, TRIA's notwithstanding clause defeats provisions that conflict with TRIA's specific terms of execution.  The District Court in *Smith* addressed execution on Iraqi assets held at the FRBNY, which President Bush confiscated under the International Emergency Economic Powers Act ("IEEPA") and delivered to the U.S. Treasury.  280 F. Supp. 2d at 317–18.  There, the plaintiffs argued that TRIA's notwithstanding clause trumped IEEPA and enabled them to reach the assets, but the *Smith* court rejected such an expansive scope of the notwithstanding clause.  *Id.* at 319–20.  The court held that "[a]lthough the 'notwithstanding' language Congress used in the TRIA was broad," "TRIA and the relevant provision of the IEEPA coexist with no conflict," so TRIA's notwithstanding clause did not permit the plaintiffs to execute on assets seized by the President under the IEEPA.  *Id.*  Applying these principles, TRIA would prevail in a statutory conflict if the Judgment Creditors sought to execute on assets but were prevented from doing so by an immunity to execution contained in 28 U.S.C. § 1610, § 1611, or some other statute.  (*See also* Report at 25.)  As Magistrate Judge Netburn rightly determined, TRIA's notwithstanding clause "is not a bulldozer that clears every possible legal obstacle between a litigant and their goal."  (*Id.* at 21.)  Because TRIA is an *execution* statute, it does not conflict with the provisions of FSIA that deal with *jurisdictional* immunity, and TRIA fails to provide the

jurisdiction over DAB assets that the Judgment Creditors need. *See Walters*, 651 F.3d at 288

(stating immunities from jurisdiction and execution operate independently).

Although secondary to the plain text, the circumstances around TRIA's passage also

supports this interpretation of TRIA's notwithstanding clause. When faced with a plausibly

ambiguous statute, a court may turn to legislative history to determine the statute's underlying

purpose or confirm a reading suggested by other tools.[9] *See, e.g., Milner v. Dep't of the Navy*, 562

U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence

of congressional intent may illuminate ambiguous text."). As noted by Magistrate Judge Netburn,

TRIA resulted from a battle between Congress and the President over the extent to which foreign

sovereign property was subject to execution. (Report at 26.) Congress modified the FSIA

exceptions in 1998 by adding 28 U.S.C. § 1610(f), which waives execution immunity for blocked

assets of a foreign state where there is a judgment against the state for acts of terrorism. 28 U.S.C.

§ 1610(f)(1). However, this iteration of the FSIA enabled the President, in the interest of national

security, to waive this immunity exception. 28 U.S.C. § 1610(f)(3); (*see also* Report at 26). The

President consistently issued such waivers, preventing the terms of the § 1610(f) exception from

ever taking effect. *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 n.6 (2018). Congress

responded with TRIA, where it "placed the 'notwithstanding' clause in § 201(a) . . . to eliminate

the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the

---

[9] This Court rejects the Judgment Creditors' misplaced emphasis on statements of *individual* members of Congress as evidence of *congressional* intent. (*See* Objections at 39–41.) Such statements "reflect at best the understanding of individual Congressmen." *Zuber v. Allen*, 396 U.S. 168, 186 (1969); *see also, e.g., SW Gen., Inc.*, 580 U.S. at 306 ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); (*see also* Nov. 29, 2022 Order on *Amici* at 4). This Court similarly declines to credit the floor statements of an individual senator cited in the Report as persuasive evidence of congressional intent. (*See* Report at 26–27 (quoting Sen. Tom Harkin).)

TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Thus, TRIA's notwithstanding clause and other broad language such as the statute's application "in every case," (*cf.* Objections at 35–36), do not abrogate the jurisdictional immunity that applies to DAB and its assets under the FSIA.

### C. Judgments Against the Taliban Are Insufficient to Reach DAB's Assets under TRIA

As an execution statute within the FSIA framework, TRIA § 201(a)'s waiver of immunity can provide a court with jurisdiction over the property of a foreign state or its instrumentality where there exists a valid underlying judgment *against the sovereign*. In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), plaintiffs obtained a default judgment against the Islamic Republic of Iran and then initiated execution proceedings against frozen assets held by separate entity Bank Melli, *id.* at 46–47. Plaintiffs held a valid judgment against Iran, for which Iran's jurisdictional immunity was waived under then 28 U.S.C. § 1605(a)(7), because the U.S. State Department had officially designated Iran as a "state sponsor of terrorism." *Id.* at 48. Bank Melli's status as an instrumentality of Iran was uncontested, but the bank argued that the district court lacked jurisdiction over the bank because it was not named in the original judgment. *Id.* at 48–49. The Court of Appeals for the Second Circuit rejected the argument and held that the plain language of TRIA § 201(a) covering "the blocked assets of any agency or instrumentality of that terrorist party" conferred subject-matter jurisdiction over an instrumentality not named in that original judgment if there was a valid judgment against the underlying sovereign. *Id.* at 50 (quoting TRIA § 201(a)).

Subsequent decisions reaffirmed that TRIA § 201 "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . *only* where 'a valid judgment has been entered' against the sovereign." *Vera II*, 946 F.3d at 133

(quoting *Vera v. Republic of Cuba*, 867 F.3d 310, 321 (2d Cir. 2017) ("*Vera I*")) (emphasis added);
*see also Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 131 (2d Cir. 2016)
("*Kirschenbaum I*"), *abrogated on other grounds by Rubin*, 138 S. Ct. 816 ("TRIA provides
jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was
original jurisdiction under the FSIA if certain statutory elements are satisfied."); (*see also* Report
at 17–18 (quoting same)). Further, the waiver of immunity from execution for foreign sovereign
property includes central bank assets otherwise protected under 28 U.S.C. § 1611, where a valid
judgment has been entered against the sovereign. *Bank Markazi v. Peterson*, 578 U.S. 212, 217
n.2 (2016) ("FSIA's central-bank immunity provision" does not limit the availability of assets
under TRIA).

  While the sovereign's loss of jurisdictional immunity in the underlying judgment flows
through to the instrumentality in the attachment proceeding, the Judgment Creditors here lack a
judgment against a sovereign. There has been no waiver of jurisdictional immunity against DAB
or Afghanistan in any of the Judgment Creditors' underlying judgments. (*See* Report at 18.)
Without a waiver of jurisdictional immunity, TRIA § 201(a) does not offer a freestanding
mechanism for waiving a foreign sovereign instrumentality's immunity to jurisdiction. (*Id.*; *supra*
Section III.B.) The *Weinstein* court held that TRIA § 201(a) provided subject-matter jurisdiction
over an instrumentality not named in that original judgment because there was a valid judgment
against Iran—the underlying sovereign. 609 F.3d at 50. Here, the Judgment Creditors' judgments
are inapposite because the Judgment Creditors hold valid default judgments against *the Taliban*,
not the underlying sovereign. (*See* Report at 19–20 (listing Judgment Creditors' judgments against
the Taliban as basis for turnover motions).) Without a waiver of jurisdictional immunity against

DAB or Afghanistan in any of the Judgment Creditors' underlying judgments, *Weinstein*'s application of TRIA is of no avail.

The Judgment Creditors misread the relevant case law in countering that any underlying judgment is sufficient to overcome the obstacle of jurisdictional immunity. In *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, the Second Circuit noted that "Congress . . . has created terrorism-related exceptions to immunity under FSIA," *id.* at 211; (*see also* Objections at 28 (quoting same)). The *Hausler* court continues, however, to explain that "[o]ne such exception is TRIA's authorization of *the attachment of the property* of terrorist parties and that of their agencies or instrumentalities to satisfy *certain judgments issued against them*." *Hausler*, 770 F.3d at 211 (emphasis added). The *Hausler* court thus construed TRIA as an execution statute where judgments are issued against parties that would otherwise have foreign sovereign immunity. In fact, *Hausler* offers yet another example of TRIA abrogating execution immunity in a case where the underlying judgment was against a foreign state—namely, the Republic of Cuba. Therefore, *Hausler*, like *Vera II*, confirms the narrowness of *Weinstein*'s holding that pertains only to situations in which there is a valid underlying judgment against a foreign sovereign. Finding that TRIA permits execution to satisfy any valid underlying judgment, whether or not against a foreign sovereign, would require overlooking the defining feature of TRIA: its abrogation of immunity enjoyed by foreign sovereigns under the FSIA.

Moreover, TRIA § 201(a) could not be wielded against Afghanistan or its instrumentalities independently because Afghanistan has not been designated as a state sponsor of terrorism. TRIA defines a "terrorist party" whose assets may be targeted as "a foreign state designated as a state sponsor of terrorism under [former] section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961." TRIA § 201(d)(4). A party may also use

TRIA to collect on judgments for acts for which a terrorist party lacks immunity under 28 U.S.C. § 1605A. *See* TRIA § 201(a). Like TRIA § 201(d)(4), section 1605A requires that a foreign state be designated as a state sponsor of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (c). Yet, Afghanistan does not qualify as either a "terrorist party" under TRIA § 201(d)(4) or a nation liable for acts of terrorism under 28 U.S.C. § 1605A because Afghanistan is not and has never been designated as a state sponsor of terrorism. (*See* U.S. Statement of Interest at 9 n.2; *Havlish* Mem. of Law on Mot. for Turnover at 3 n.7.)

In sum, the Judgment Creditors' motions fail because DAB is a central bank under the FSIA, and TRIA § 201(a) does not overcome DAB's jurisdictional immunity under 28 U.S.C. § 1604. Furthermore, the Judgment Creditors cannot use TRIA to reach DAB's assets because their judgments are against the non-sovereign Taliban—not the sovereign nation of Afghanistan—and Afghanistan has never been designated as a state sponsor of terrorism.

## IV. THE U.S. CONSTITUTION RESTRAINS THIS COURT FROM THE FINDING REQUIRED UNDER TRIA TO ATTACH DAB'S ASSETS

Even if this Court had jurisdiction, the U.S. Constitution prevents this Court from rendering the findings that TRIA requires. For the Judgment Creditors to prevail, this Court must be able to find that DAB is a Taliban "agency or instrumentality." Finding that the Taliban controls DAB or can use DAB to advance its goals implies that the Taliban is Afghanistan's government. The Constitution vests this authority to recognize governments in the Executive Branch alone. (*See also* Report at 27–37.)

### A. The Judgment Creditors Fail to Satisfy All the Required Elements in the Legal Framework Governing Their Turnover Motions

Federal Rule of Civil Procedure 69(a), New York CPLR §§ 5225(b) and 5227, and TRIA § 201 govern these turnover motions. Under Rule 69(a), judgments are enforced through a writ of

execution, and the laws of the state where the court is located govern execution procedures unless a federal law applies. Fed. R. Civ. P. 69(a)(1). In New York, CPLR §§ 5225(b) and 5227 govern turnover proceedings. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018) ("*CSX I*"). These statutes are "essentially interchangeable," *CSX Transportation, Inc. v. Emjay Env't Recycling, LTD.*, No. 12-cv-1865 (JS)(AKT), 2016 WL 755630, at *3 (E.D.N.Y. Feb. 25, 2016) (quoting *LaBarbera v. Audax Constr. Corp.*, 971 F. Supp. 2d 273, 278 (E.D.N.Y. 2013)); (*see also* Objections at 5 n.5), and Magistrate Judge Netburn properly analyzed the turnover motions under CPLR § 5225(b) for simplicity,[10] (Report at 28). Under CPLR § 5225(b), the judgment creditor must show that (1) the judgment debtor has an interest in the property the creditor is targeting and (2) the judgment creditor is entitled to the property or has rights superior to the party possessing the property. *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019) (citation omitted).

A judgment creditor seeking turnover pursuant to TRIA will also have to satisfy the requirements of TRIA § 201(a): (1) the judgment creditor has obtained a judgment against a terrorist party, (2) on a claim based on an act of terrorism or an act for which a terrorist party is not immune under 28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7),[11] which the creditor seeks to satisfy with the (3) blocked assets, (4) of that terrorist party or that terrorist party's agency or instrumentality, (5) to the extent of only the creditor's compensatory damages. TRIA § 201(a); (*see also* Report at 29 (same).)

---

[10] New York CPLR § 5225(b) permits judgment creditors to initiate "a special proceeding . . . against a person in possession or custody of money . . . in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property . . . ."

[11] As previously noted, Congress repealed FSIA § 1605(a)(7)'s terrorism exception to immunity and replaced it with § 1605A in 2008. Pub. L. No. 110–181, div. A, title X, § 1083(a)(1), 122 Stat. 338–44 (2008).

The Judgment Creditors satisfy all but one element under TRIA. First, the Judgment Creditors hold judgments against the Taliban, a "terrorist party" as defined under TRIA § 201(d)(4) by reference to 8 U.S.C. § 1182(a)(3)(B)(vi). *See* 8 U.S.C. § 1182(a)(3)(B)(iii)–(vi) (describing a terrorist organization as one committing or materially supporting activities such as hijacking, assassination, and the use of explosives to threaten individuals and property). Second, all of the judgments are based on the Taliban's role in the 9/11 Attacks or separate explosive attacks against Americans for which the Taliban is not immune. (*See* Report at 29 (listing judgments).) Third, the turnover motions seek DAB funds that constitute "blocked assets" under TRIA. *See* TRIA § 201(d)(2)(A) (defining blocked assets as "any asset seized or frozen by the United States . . . under sections 202 and 203 of the [IEEPA]. . . ."); E.O. 14,064 (blocking DAB funds pursuant to IEEPA). Finally, the Judgment Creditors seek only compensatory damages. (*See* Report at 30 (citing turnover motions).) Missing is the fourth prong required by TRIA: the blocked assets must be the assets of the terrorist party or the terrorist party's agency or instrumentality. TRIA § 201(a).

## B.  This Court Lacks the Power to Recognize the Government of Afghanistan under the U.S. Constitution

The Judgment Creditors urge this Court to find that DAB is an "agency or instrumentality" of the Taliban. "TRIA, unfortunately, does not" define the meaning of a terrorist party's "agency or instrumentality." *Kirschenbaum I*, 830 F.3d at 132. Thus, the Second Circuit in *Kirschenbaum I* construed the terms "according to their ordinary meanings," holding that an entity is an agency or instrumentality of a terrorist group if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." *Id.* at 135. Here, for the Judgment Creditors to prevail in their turnover motions, this Could would have to

make a judicial finding that DAB provided the Taliban with material functionality, material services, or was owned, controlled, or directed by the Taliban.

Under *Kirschenbaum I*, the government of Afghanistan necessarily exercises a degree of control or authority over its own central bank to make the central bank the Afghan government's agency or instrumentality. For instance, FSIA § 1611 stipulates that the property of a central bank is immune from attachment and execution "unless such bank or authority, or its *parent foreign government*, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . ." *Id.* § 1611(b)(1) (emphasis added). Section 1611 thus conveys that a foreign government exercises control over the central bank, *e.g.*, through the foreign government's ability to waive the immunity of its central bank's property to attachment and execution.

DAB is Afghanistan's central bank and thus a government instrumentality subject to the government of Afghanistan. *See supra* Section III.A. The Judgment Creditors further argue that the Taliban is exercising control over DAB. (*See, e.g.*, Objections at 11 ("the Taliban retook control of DAB"); *id.* at 43–51.) The Judgment Creditors assert that the Taliban has appointed loyalists to key DAB leadership positions, women and dissidents have left DAB jobs, and non-Taliban personnel are merely figureheads. (*See* Report at 32 (citing *Havlish* and *Smith* expert reports for claims that the Taliban appointed DAB's Acting Governor, First Deputy Governor, and Second Deputy Governor).) The Judgment Creditors also argue that the Taliban is using DAB to set Afghanistan's monetary policy and manage the country's financial sector. (*Id.*) Additionally, in August 2021, "[t]he Taliban reportedly visited the central bank and asked to inspect its reserves, only to be told that most were located in New York." (Taliban Background at 39; *see also* Report at 33 (citing same).) The judicial finding the Judgment Creditors seek necessarily and impermissibly implies that the Taliban constitutes the recognized government of Afghanistan.

The Constitution vests in the Executive Branch the primary role of managing foreign affairs. *See Chicago & Southern Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) (characterizing the President "as the Nation's organ in foreign affairs"); *U.S. v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (deeming the President "the sole organ of the federal government in the field of international relations"). Critically, "[t]he text and structure of the Constitution grant the President the power to recognize foreign nations and governments." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."). Courts have long encouraged judicial modesty in recognizing foreign governments, understanding that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.'" *Baker v. Carr*, 369 U.S. 186, 212 (1962) (quoting *United States v. Klintock*, 18 U.S. 144, 149 (1820)). Similarly, courts have consistently held that unrecognized regimes lack standard privileges and immunities of foreign sovereigns, reasoning that permitting such regimes to invoke that status would encroach on the President's recognition power. *See, e.g., Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 444 (S.D.N.Y. 2004); *Fed. Rep. of Germany v. Elicon*, 358 F. Supp. 747, 756 (E.D.N.Y. 1970).

The President has the exclusive power to grant formal recognition to a foreign sovereign. *Zivotofsky*, 576 U.S. at 28 ("[T]he power to recognize foreign states and governments . . . is exclusive to the Presidency."). In *Zivotofsky ex rel. Zivotofsky v. Kerry*, the Supreme Court evaluated a conflict between the Foreign Relations Authorization Act, Fiscal Year 2003 (the "FRAA") and the U.S. State Department's Foreign Affairs Manual (the "FAM"). *See id.* at 5–8. In accordance with then-presidential policy to decline acknowledging any nation's sovereignty

over the city of Jerusalem, the FAM required that the State Department list place of birth as "Jerusalem" rather than "Israel" on the passports for those born in Jerusalem. *Id.* at 6–7. However, the FRAA allowed (though did not require) those born in Jerusalem to list their place of birth as "Israel" on their passports. *Id.* at 7. The Supreme Court held that this accommodation, although "not itself constitut[ing] a formal act of recognition," was unconstitutional because it was "a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State." *Id.* at 30.

The Constitution forbids this Court from determining what the Judgment Creditors require under TRIA: a finding that the Taliban regime is in control of DAB—an instrumentality of the government of Afghanistan—and that the Taliban thus acts as the government of Afghanistan. Promoting financial stability and managing foreign reserves are the quintessential public and government functions performed by central banks. *See, e.g., Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004); *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 195 (2d Cir. 2011). The Judgment Creditors "suggest that DAB is an agency or instrumentality of the Taliban because it has appointed leaders and those leaders are promulgating policies or taking acts like the elimination of money-laundering controls that materially advance the Taliban's goals." (Report at 35.)   Accepting the Taliban's "appointments" to DAB as legitimate or its pronouncements as authoritative monetary policies bestows recognition on the Taliban that this Court may not constitutionally confer. *See, e.g.,* DAB, DA AFGHANISTAN BANK LAW art. 11 (2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf (last visited Feb. 7, 2023) ("The Governor, the First Deputy Governor and the other members of the Supreme Council shall be appointed by a decree of the *President* of Afghanistan . . . .") (emphasis added).   As Magistrate Judge Netburn rightly found, "[t]o credit those appointments as evidence of Taliban

control would be to suggest that the group is wielding power that was until recently vested in the Afghan state and the Republic." (Report at 36.)

This Court "can acknowledge the facts on the ground while recognizing that those facts do not permit it to recognize the Taliban as the government of Afghanistan directly or by implication." (Report at 34.) In September 2021, Secretary of State Antony Blinken did just that, acknowledging that the Taliban was the "*de facto* government" of Afghanistan. (*Id.* at 33 (citation omitted).) While Secretary Blinken and this Court can acknowledge the Taliban's *de facto* dominance over Afghanistan, accepting the Judgment Creditors' argument as to the Taliban's control over DAB makes the implied recognition of the Taliban as Afghanistan's government inescapable. (*See also* Report at 34.)

The Judgment Creditors' effort to distinguish between formal and informal recognition of a foreign government conflates Congress' powers with those of the Judiciary. The Judgment Creditors argue that only "formal" acts of recognition, such as an express declaration, concluding a treaty, or exchanging ambassadors, implicate the constitutional separation of powers. (Objections at 48–49.) While the *Zivotofsky* Court held that the "Executive's exclusive power extends no further than his formal recognition determination," 576 U.S. at 30, the non-exclusive, informal acts of recognition are shared with *Congress*, not the courts, *id.* at 22. "[T]he Court . . . mentioned both of the political branches in discussing international recognition, but it [did] so primarily in affirming that the Judiciary is not responsible for recognizing foreign nations." *Id.* (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("Who is the sovereign, *de jure* or *de facto,* of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges.")

(quotation marks and citation omitted)).  The *Zivotofsky* Court thus denied any judicial role in the recognition of a foreign government.

"Recognition is a topic on which the Nation must 'speak . . . with one voice'" in order to determine "which governments are legitimate in the eyes of the United States and which are not." *Id.* at 14 (quoting *Am. Ins. Assn. v. Garamendi*, 539 U.S. 396, 424 (2003)).  This Court would intrude with a voice of its own were it to permit Afghanistan's treasury to pay the Taliban's judgment debts, even as the President declines to recognize the Taliban as the government of Afghanistan.

The fundamental conclusion—as required by TRIA and the Constitution—is that neither the Taliban nor the Judgment Creditors are entitled to raid the coffers of the state of Afghanistan to pay the Taliban's debts.  While the "funds of foreign central banks are managed through those banks' accounts in the United States, those funds are, in fact, the reserves of the foreign states themselves." *NML Cap., Ltd.*, 652 F.3d at 189 (cleaned up).  DAB funds are the property of the state of Afghanistan, and "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 205(2); *see also Repub. of Panama v. Rep. Nat. Bank of N.Y.*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988) ("[I]t is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of" a foreign nation.) (quotation marks and citation omitted).  Therefore, as the Restatement provides and TRIA and the Constitution dictate, this Court cannot find that the Taliban is entitled to Afghanistan's state funds held at the FRBNY or that the Judgment Creditors can obtain those funds through their default judgments against the Taliban.

## V.   CONCLUSION

The Judgment Creditors are entitled to collect on their default judgments and be made whole for the worst terrorist attack in our nation's history, but they cannot do so with the funds of the central bank of Afghanistan.   Pursuant to the FSIA, TRIA, and the U.S. Constitution, the Taliban—not the former Islamic Republic of Afghanistan or the Afghan people—must pay for the Taliban's liability in the 9/11 Attacks.   Therefore, the Judgment Creditors' motions for turnover of DAB funds (ECF Nos. 7763, 7767, and 7936 in 03-md-1570; ECF No. 62 in 01-cv-10132; ECF No. 597 in 03-cv-9848) are DENIED.[12]   The Judgment Creditors' motion for post-judgment attachment (ECF No. 8586 in 03-md-1570), *Ashton* Plaintiffs' motion for attachment (ECF No. 8412 in 03-md-1570; ECF No. 1724 in 02-cv-6977), *Ashton* Plaintiffs' motion for a protective order (ECF No. 7895 in 03-md-1570), *Owens* Proposed Intervenors' motion to intervene (ECF No. 8018 in 03-md-1570; ECF No. 1120 in 03-cv-6978), and *Federal Insurance* Creditors' motion to vacate (ECF No. 8055 in 03-md-1570) are DENIED as moot.   The Clerk of Court is directed to close the motions accordingly.


Dated: February 21, 2023
       New York, New York

                                        SO ORDERED.

                                        *George B. Daniels*

                                        GEORGE B. DANIELS
                                        United States District Judge

---

[12] This decision in no way affects the Executive Branch's prerogative in determining the ultimate disposition of the blocked DAB assets that remain held at the FRBNY.